JONES, ADMX., APPELLANT, *v.*
WHITE MOTOR CORP. ET AL., APPELLEES.

[Cite as Jones v. White Motor Corp. (1978),
61 Ohio App. 2d 162.]

(No. E-77-44—Decided September 29, 1978.)

*Mr. Michael T. Murray,* for appellant.
*Mr. Herbert P. Eastman,* for appellees.

POTTER, P. J.   This is a products liability case based on an alleged dangerous design. Bobby Jones died from injuries received when he was run over by a Euclid R-50, a large hauling vehicle, driven by appellee William Hale and manufac-

tured by appellee Euclid, Inc., a wholly owned subsidiary of White Motor Corporation. The Euclid R-50 manufactured in 1971 is a large truck not for highway use but designed for use in quarries, mines and construction sites. It weighs approximately 85,000 pounds, has a capacity of 50 tons, is approximately 33 feet long and 13 feet wide, and has a height of 14 feet. It is used throughout the United States. The operator sits in a protected cab to the left of the hood. The hood is to the front of the truck and centered. The eight-foot hood protrudes forward causing a substantial blind area to the operator's right. The truck was sold to Sandusky Crushed Stone Company, Inc., to be used in its quarry operations. Plaintiff, the appellant herein, as administratrix of the estate of Bobby Jones, filed a wrongful death action against defendants Hale, White Motor Corporation and Euclid, Inc., the appellees. A jury trial resulted in a verdict in favor of defendants. Plaintiff's motion for a new trial was denied and she appeals to this court, filing the following assignments of error:

"1. It is reversible error and contra to plaintiff's requested jury instruction No. 4 to instruct the jury that Euclid, Inc. is under no duty to guard against injury from an obvious peril.

"2. When the jury instructions are read in a disjointed and confusing manner, and different sections of the charge contradict each other, neither plaintiffs nor defendants are accorded a fair, just, rational resolution of the dispute between them, according to law, necessitating a new trial.

"3. It is reversible error and contra to plaintiff's requested jury instruction No. 4 to instruct the jury that, 'If the defendant, Euclid, Inc., in the design of and on sales of its machine met the reasonable standards of safety in the industry in which it was operating and created no unreasonable risk of injury to the operators, you cannot find the defendant, Euclid, Inc., negligent' ".

"4. It is reversible error to instruct the jury that contributory negligence is a defense to an action based on a breach of implied warranty claim necessitating a defense verdict and then submit to the jury a list of special interrogatories, the first of which states, "Did Bobby Jones contribute to the accident by *his own negligent act* of stepping in front of the Euclid R-50 as it started forward?

"5. It was reversible error for the trial judge to exclude the testimony of Mr. Howard Bristow relating to the effect and purpose of a forward warning on the Euclid R-50: whether such systems were available in 1971; and his opinion as to whether or not the design was defective.

"6. The verdict was against the weight of the evidence.

"7. The court should not have permitted the interrogatories to be submitted to the jury in the form presented.

"8. The court improperly dismissed White Motors as a defendant."

We find assignments of error Nos. 1, 2, 3, 4, and 7 well taken for the reasons and to the extent hereinafter set forth. The judgment as to White Motor Corporation is affirmed for the reasons set forth under assignment of error No. 8. It is also affirmed as to William Hale, since this appeal has not been directed to him. The judgment is reversed as to Euclid Incorporated.

Bobby Jones was employed as a mechanic by Sandusky Crushed Stone for approximately six years. On June 26, 1973, Mr. Jones reported to work as usual and went into the clock house, where the time cards for most, if not all employees, were kept. Lined up in the roadway near the clock house were five Euclid R-50's, all with their engines running. It was the general practice for the Euclid operators to park these vehicles in front of the clock house and to leave them running while the driver went inside to punch their time cards. Mr. Jones, like all of the workers in the machine shop, had to cross the roadway where the vehicles were parked in order to get from the clock house to the machine shop. On this particular day, quarry foreman, Burley Burkhardt was sitting in a pickup truck about 250 feet to the southeast of the clock house. Mr. Burkhardt saw Mr. Jones just as he was walking around the right front corner of the first Euclid R-50. According to Mr. Burkhardt, the Euclid R-50 started to move forward just as Mr. Jones was stepping in front of it, Mr. Jones was struck by the right front bumper and run over by the front and back wheels of the vehicle. Euclid argues that the evidence warrants an inference that the decedent, wearing dress shoes, may have slipped and fallen into the path of the vehicle. The vehicle which struck Mr. Jones was driven by William Hale, who testified at trial that he did not

see Mr. Jones and did not know that an accident had happened until someone flagged him down after Mr. Jones was struck.

Plaintiff claimed that the Euclid R-50 was defective in that it was manufactured according to an unreasonably unsafe design and that the defective condition of the vehicle was the proximate cause of Mr. Jones' death. Plaintiff's expert witnesses testified that it was feasible to use outside mirrors on the vehicle to substantially reduce the blind area and, or, to equip the vehicle with an automatic forward horn or other warning system. Defense witnesses disputed the feasibility of changes in the design of the 1971 Euclid R-50 and testified that in the design of a vehicle to haul fifty tons of stone over a variety of terrain and conditions, concern must be had for the operator and his protection, the weight distribution, the suspension system, and pitch mode of the vehicle, its stability etc., and the best position of the cab for visibility, considering all factors. They also testified as to the absence of governmental regulations or rules which would require the changes in design urged by plaintiff. In effect, this was a conscious design choice of the manufacturer. See *Back* v. *Wickes Corp.* (1978),—Mass.—, 378 N. E. 2d 964.

At the close of plaintiff's case, the court granted a defense motion to dismiss White Motor Corporation as a party defendant, but denied a motion for a directed verdict in favor of Euclid, Inc. After the presentation of defendants' case, the cause went to the jury, which answered interrogatories and returned a verdict in favor of defendants Hale and Euclid.

On other occasions, we have noted that the area of products liability is a turbulent one. We are aware that we are about to chart an uncertain course across a troubled sea, but our uncertain course results from the emerging and uncertain law in products liability, not only in Ohio but across the country. See annotation 76 A.L.R. 2d 91; annotation 46 A.L.R. 3d 240; annotation 33 A.L.R. 3d 415; 63 American Jurisprudence 2d 9, Products Liability, Section 1; 25 Vanderbilt L. Rev., where a number of articles are presented.

Our travail results in the case sub judice, in particular from the application of 2 Restatement of Torts 2d 347, Section 402A (1965), which has been adopted in Ohio (see *Temple*

v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317) and 2 Restatement of Torts 2d 336, Section 398 (1965), as both apply to an "active" as compared to a "passive" bystander. (Many cases refer to a passive bystander as the "innocent" bystander. See *Lamendola* v. *Mizell* (1971), 115 N.J. Super. 514, 280 A. 2d 241.) These sections read as follows:

"398. Chattel Made Under Dangerous Plan or Design. A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design."

"402A. Special Liability of Seller of Product for Physical Harm to User or Consumer.

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Restatement of Torts 2d 347, Section 402A (1965), has a well noticed caveat that the drafters take no position as to the application of the rule to bystanders. See, however, comment as to this caveat. With regard to contributory negligence, Section 402A, Comment n, states as follows: '

"*Contributory negligence.* Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases (see §524) applies. Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the

form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. *If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery."* (Emphasis added.)

We will comment later on the issue of contributory negligence.

*Merger of Restatement of Torts 2d 402A and 398 Principles*

First, we hold that in the case of a design defect products liability case, based on 402A, "defective condition unreasonably dangerous," and 398, "dangerous for the uses etc.," particularly where the case involves a bystander, the two rules merge. See *Jiminez* v. *Sears-Roebuck & Co.* (1971), 4 Cal. 3d 379, 384, 482 P. 2d 681, 684, as follows:

"In *Pike* v. *Frank G. Hough Co.*, 2 Cal. 3d 465, 475, (85 Cal. Rptr. 629, 467 P. 2d 229), decided subsequent to the trial in the instant case, we categorized a product in a defective condition as one which was 'unreasonably dangerous' to the user, consumer, or bystander. (See Rest. 2d Torts, §402A.) The case held that strict liability could be imposed for defective design of a product as well as defective manufacture. By focusing on unreasonably dangerous, this test of defect becomes similar to but not necessarily the same as the test for negligent design. (Compare discussion of negligence liability in *Pike* v. *Frank G. Hough Co.*, *supra,* 2 Cal. 3d 465, 470-474; Rest. 2d Torts, §398.)***"

See, also, Prosser on Torts 644, Section 96 (4th ed. 1971), as follows:

"The development and recognition of strict liability has had a natural tendency to reduce the number of actions founded on negligence; but it continues to have a great deal of importance, if only because counsel for the plaintiff, for reasons readily understandable, have continued to plead and endeavor to prove it. There are, in addition, two particular areas in which the liability of the manufacturer, even though it may occassionally be called strict, appears to rest primarily

upon a departure from proper standards of care, so that the tort is essentially a matter of negligence.

"One of these involves the design of the product, which includes plan, structure, choice of materials, and specifications. There is no doubt whatever that the manufacturer is under a duty to use reasonable care to design a product that is reasonably safe for its intended use, and for other uses which are foreseeably probable. The question turns on what is reasonable care and what is reasonable safety. The maker is not required to design the best possible product, or one as good as others make, or a better product than the one he has, so long as it is reasonably safe. But the fact that others are making [a] similar product with a safer design may be important evidence bearing upon the defendant's reasonable care. Likewise the fact that others make use of the same design is evidence for the defendant, although it is not always conclusive.***"

Also see *Bradford* v. *Bendix-Westinghouse* (1978), 33 Colo. App. 99, 108, 517 P. 2d 406, 412, as follows:

*"Defective Condition*

"Bendix further argues that even if strict liability under Section 402A is applicable, the facts before us do not establish the first element which is, a 'defective condition unreasonably dangerous to the user.' While a single all-inclusive definition of the phrase of Section 402A has not been formulated (*see* Traynor, *The Ways and Meanings of Defective Products and Strict Liability, 32 Tenn. L. Rev.* 363), the word 'defective' in that phrase does encompass imperfections in manufacture such as the 'cold-shut' in this case. *See Lunt* v. *Brady Mfg. Co.,* 13 Ariz. App. 305, 475 P. 2d 964. It has also been established that a defect in manufacture consisting of the use of a material which may not be safely used for the purpose intended is also within the purview of §402A, *Fanning* v. *Lemay,* 78 Ill. App. 2d 166, 222 N.E. 2d 815, and that a properly manufactured product is defective if its design is unreasonably dangerous. *Pike* v. *Frank G. Hough Co.,* 2 Cal. 3d 465, 467 P. 2d 229; *Berkebile* v. *Brantly Helicopter Corp.,* 219 Pa. Super. 479, 281 A. 2d 707. *See generally W. Prosser, Law of Torts* §99 (4th ed.). From the record before us, a jury could reasonably have concluded that the brake pedal assembly contained a defect of any one or all

three of the kinds of defects mentioned in this paragraph."
The court went on to say, at 112, 517 P. 2d at 414:

*"Negligence*

"The complaint also alleges that Bendix was negligent 'in its design, manufacture, sale, and servicing of the said brake pedal, brake pedal base and brake pedal assembly.' Plaintiffs offered evidence on several points concerning the various parts to the assembly base, the failure of Bendix to inspect the brake pedal base for flaws such as the 'cold shut,' and the failure of Bendix in designing the assembly to insure that the fulcrum pin could not become disengaged. A manufacturer has the duty of care to design his product so that it will be safe for the use for which it was intended. *Pike* v. *Frank G. Hough Co., supra.* From the evidence presented, the jury reasonably could have concluded that the conduct of the defendant constituted negligence in the design and sale of the entire assembly.***"

In *Jones* v. *Hutchinson Mfg., Inc.* (Ky. 1973), 502 S.W. 2d 66, the court was confronted with the same problems which faced this court. We quote at some length from the decision in that case because it so ably expresses our views relative to the merger of Sections 402A and 398.

It is stated at pages 69-70:

"It appears, therefore, that we are confronted with the first case of alleged deficient design of a product by a manufacturer since we adopted the so-called doctrine of strict liability as enunciated in section 402A of the Second Restatement of Torts in *Dealer's Transport Co.* v. *Battery Distributing Co.,* Ky., 402 S. W. 2d 441 (1965). An additional element relevant to our consideration of the problems raised is that aside from our 1965 adoption of the strict liability concept we have previously subscribed to the general view espoused in section 395 of the Second Restatement of Torts that a manufacturer is subject to liability to those whom he should expect to use his product or to be endangered by its probable use where the product is made under a design which makes it dangerous for the uses for which it is manufactured. See *Herme* v. *Tway,* Ky., 294 S. W. 2d 534 (1956), wherein we approved application of the standard of reasonable care to the manufacturer under the generalized statement of Section 395 of the Second Restatement of Torts. Section 398 of the

same work is a special application of the general rule contained in Section 395. Under Section 398 the standard of conduct required is to 'exercise reasonable care in the adoption of a safe plan or design.'

"Section 402A of the Second Restatement expresses the so-called 'strict liability' principle in terms of a product 'in a defective condition unreasonably dangerous to the user or consumer or to his property.' Prosser, the principal draftsman of this section, says in his treatise that a product is 'defective' for purposes of application of the strict liability principle when it is made according to an unreasonably dangerous design. Prosser, Handbook of the Law of Torts, section 99, page 659 (4th Edition 1971).

"In the same treatise, the author makes the following statements we deem applicable to the case at bar [see the applicable quote from Prosser, *supra*.] :***.

"We think it apparent that when the claim asserted is against a manufacturer for deficient design of its product the distinction between the so-called strict liability principle and negligence is of no practical significance so far as the standard of conduct required of the defendant is concerned. In either event the standard required is reasonable care. Hence, it is unnecessary in this case to consider whether Section 402A extends to 'bystanders.' If the manufacturer failed to observe the standard required, he is subject to liability to those whom he should expect to use the product or to be endangered by its probable use under the principles of Section 398. Section 402A imposes possible liability only upon failure to observe the same standard of conduct where the claim is for deficient design of the product. Therefore, in deficient design claims the 'bystander' or 'nonconsumer' or 'nonuser' problem resolves itself."

### Duty

In the case sub judice the plaintiff did not plead separate counts of implied warranty or, in effect, strict liability in tort and dangerous design, but alluded to both. We conclude that in the instant case the standard of conduct or duty required under both Section 402A and Section 398 is the same. In Prosser, *supra, Jones* v. *Hutchinson Mfg. Inc., supra, Jiminez* v. *Sears-Roebuck & Co., supra,* and other cases already mentioned, we find that this duty is "to design a pro-

duct that is reasonably safe for its intended use, and for other uses which are foreseeably probable." See also *Prentiss* v. *Kirtz* (1977), 54 Ohio App. 2d 56.

Some of the tests and considerations are found in *Jones,* at page 70:

"The evidentiary material introduced by the manufacturer was to the effect that all expert designers in the industry designed grain augers in the same manner as was done in the case of the auger in question. Product design is a function that is in part, at least, subjective though governed by principles which are part of a body of learning that has developed through experiment, testing, and experience. The uncontradicted evidence is that the design involved was regarded by the industry as the safest possible under the circumstances to achieve proper functioning of the product. We think this situation is different from that presented where an entire industry or part of it customarily fails to do that which is known and available and practicable.

"In an annotation, Products Liability—Duty as to Design, 76 A.L.R. 2d, 93, 94, the annotator comments that there is not a great deal of decisional law on the problem of the manufacturer's duty as to product design. According to this annotation, there are two fundamental rules applicable: first, the duty is one of reasonable care, under the circumstances; second, neither a manufacturer nor a seller is an insurer that his product is, from a design viewpoint, incapable of producing injury. 'Farm machinery cannot be accident proof. It is a matter of common knowledge that injuries frequently occur in the operation of mowers, threshers, corn shellers and similar equipment.' Anno.: Products Liability—Machinery—Tools, 78 A.L.R. 2d, page 604.

"We agree that if an industry adopts careless methods, it cannot be permitted to set its own uncontrolled standard. *Herme* v. *Tway,* KY., 294 S. W. 2d 534 (1956). If the only test is to be that which has been done before, no industry or group will ever have any great incentive to make progress in the direction of safety. We also agree, however, with Prosser's declaration that: 'Cases will no doubt be infrequent in which any defendant will be held liable for failing to do what no one in his position has ever done before; but there appears to be no doubt that they can arise.' Prosser, Handbook of the Law of Torts, section 33, page 167 (4th Edition 1971)."

Even under a pure Section 402A case, the manufacturer is not an insurer and strict liability is not absolute liability. However, under 402A there may be the requirement to warn. See comment j. The duty to warn of the blind area is not an element in the case sub judice as far as the operator was concerned. As to the decedent, we do not find, as a matter of law, an obligation on the part of the manufacturer to warn as to the blind area. Perhaps under some conditions the user should have utilized a flagman or other precautions. In the instant case, the issue to warn is merged with the conduct of the decedent as it related to obviousness (surprise factor), duty, contributory negligence and, or, assumption of the risk. See comment n to Section 402A.

Also in the context of duty to the bystander is the issue of foreseeability. See annotation 100 A.L.R. 2d 942. This is a tort issue and is not based on privity or contract principles. See *Lonzrick* v. *Republic Steel Corp.* (1966), 6 Ohio St. 2d 227; *Sills* v. *Massey-Ferguson, Inc.* (1969), 296 F. Supp. 776. Both plaintiff and defendant agree that Bobby Jones was a foreseeable party.

While it has been noted that a plaintiff in a proper products liability case may seek recovery on both theories of strict liability in tort and in negligence, even though to a large extent the two theories are parallel (see *Jiminez, supra*), nevertheless, in the instant case on the facts and law as presented, as we have stated, the principles merged.

### Bystanders and Section 402A

Since we subsequently conclude that substantial justice warrants a new trial so that counsel can fully explore the field of products liability in the adversary posture, a task beyond the scope of this opinion, and more fully assist the trial court in the preparation of the charge to the jury, we make this observation as to the application of Section 402A to bystanders. We see no logical reason why the principle enunciated in Section 402A should not apply to a bystander. Other courts have come to the same conclusion. In addition to the cases cited above, see *Mitchell* v. *Miller* (1965), 26 Conn. Super. 142, 214 A. 2d 694; *Sills* v. *Massey-Ferguson, Inc., supra;* and annotation 33 A.L.R. 3d 415.

### Contributory Negligence

Coming now to the issue of contributory negligence as

this defense relates to the active bystander compared to the "innocent bystander," we find that Comment n., as quoted above, is applicable, but that the further elaboration by Prosser is relevant. See Prosser, *supra,* at pages 670-671, as follows:

"*Contributory Negligence*

"Contributory negligence is not the same thing as abnormal use; and although the two frequently coincide, one may exist without the other. There is no doubt that where the plaintiff's action is founded on negligence, his contributory negligence will bar his recovery to the same extent as in any other negligence case. But so far as strict liability is concerned, the decisions are ostensibly in a state of flat contradiction as to whether contributory negligence is available as a defense.

"Nearly all of the decisions have involved warranty, either on a direct sale or without privity. It has been said very often that contributory negligence is never a defense to strict liability. It has been said somewhat more often that it is always a defense. The disagreement, however, is a superficial one of language only, and is merely part of the general murk that has surrounded 'warranty.' If the substance of the cases is looked to, with due regard to their facts, they fall into an entirely consistent pattern.

"If the plaintiff's negligence consists only in a failure to discover the danger involved in the product, or to take precautions against the possibility of its existence, as in the case of negligent driving on a defective tire, it is quite clear that it is no defense to the strict liability. Thus if the plaintiff drinks a beverage without discovering that it is full of broken glass, his failure to exercise due care in doing so does not relieve the defendant. On the other hand the kind of negligence which consists of proceeding voluntarily to encounter a known unreasonable danger and which tends to overlap the defense of assumption of risk, will relieve the defendant of liability. If the plaintiff continues to operate a washing machine after discovery that the wringer is dangerously defective, or negligently drives on a tire that he knows to be unsafe, he cannot recover.***"

See, also, references in footnote 85. *Cf. Maiorino* v. *Weco Products Co.* (1965), 45 N.J. 570, 214 A. 2d 18; *Ettin* v. *AVA Truck Leasing, Inc.* (1969), 53 N.J. 463, 251 A. 2d 278.

174

The Section 398 principle clearly applies to bystanders. See *Jones* v. *Hutchinson Mfg., Inc.* (Ky. 1973), 502 S.W. 2d 66; *Passwaters* v. *General Motors Corp.* (C.A. 8, 1972), 454 F. 2d 1270. Moreover, in a 398 case, the defenses of contributory negligence and assumption of the risk likewise may apply. Furthermore, where a danger is as obvious to the plaintiff as it is to the defendant, the defendant may not be liable for the reason of lack of duty. See Prosser, *supra,* Section 96. *Cf. DeAmiches* v. *Popczun* (1973), 35 Ohio St. 2d 180; *Mikula* v. *Slavin Tailors* (1970), 24 Ohio St. 2d 48. Obviousness of the peril is discussed *infra.*

### Assignments of Error

We come now to consider assignments of error Nos. 1, 2 and 3, which for convenience we repeat. They are as follows:

"1. It is reversible error and contra to plaintiff's requested jury instruction No. 4 to instruct the jury that Euclid, Inc. is under no duty to guard against injury from an obvious peril.

"2. When the jury instructions are read in a disjointed and confusing manner, and different sections of the charge contradict each other, neither plaintiffs nor defendants are accorded a fair, just, rational resolution of the dispute between them, according to law, necessitating a new trial.

"3. It is reversible error and contra to plaintiff's requested jury Instruction No. 4 to instruct the jury that, 'If the defendant, Euclid, Inc., in the design of and on sales of its machine met the reasonable standards of safety in the industry in which it was operating and created no unreasonable risk of injury to the operators, you cannot find the defendant, Euclid, Inc., negligent.''

As to these assignments of error, we do not find in the record either plaintiff's or defendants' request for jury instructions. We further find that Civ. R. 51 was not strictly complied with in that the parties assumed that a general objection to the charge was sufficient. Civ. R. 51 requires that:

"***A party may not assign as error the giving or the failure to give any instructions unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.***''

To support its position in opposition to assignment of error No. 1, defendants' rely on *Campo* v. *Scofield* 301 N.Y. 468, 95 N.E. 2d 802. Neither counsel has commented on the fact that this case has been overruled by *Micallef* v. *Miehle Co.* (1976), 39 N.Y. 2d 376, 348 N.E. 2d 571, no doubt because the principle is still asserted in many cases. The *Campo* doctrine denied recovery as a matter of law for an obvious peril. The case has also been criticized by text writers, see 1 Frumer & Friedman, Products Liability, Section 7.02. Whereas an obvious peril may bear on duty (see the discussion *supra*), where such a reference is proper, generally an obvious peril would bear on the consideration of contributory negligence or assumption of the risk. In *Micallef, supra,* at page 379, 348 N.E. 2d at 573, and at page 385-387, 348 N.E. 2d at 577-579, the court said, inter alia, the following:

"The time has come to depart from the patent danger rule enunciated in *Campo* v. *Scofield* (301 N.Y. 468). 95 N.E. 2d 802.***

"***Campo suffers from its rigidity in precluding recovery whenever it is demonstrated that the defect was patent. Its unwavering view produces harsh results in view of the difficulties in our mechanized way of life to fully perceive the scope of danger, which may ultimately be found by a court to be apparent in manufactured goods as a matter of law. ***Apace with advanced technology, a relaxation of the *Campo* stringency is advisable. A casting of increased responsibility upon the manufacturer, who stands in a superior position to recognize and cure defects, for improper conduct in the placement of finished products into the channels of commerce furthers the public interest. To this end, we hold that a manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended (2 Harper & James, Torts, §28.3; see, also, *Pierce* v. *Ford Motor Co.,* 190 F. 2d 910), as well as an unintended yet reasonably foreseeable use (see *Bolm* v. *Triumph Corp.,* 33 N.Y. 2d 151, 157-158; *Green* v. *Volkswagen of Amer.,* 485 F. 2d 430; *Gardner* v. *Q.H.S., Inc.* 448 F. 2d 238; *Larsen* v. *General Motors Corp.,* 391 F. 2d 495; *Ethicon, Inc.* v. *Parten,* 520 S.W. 2d 527 (Tex.); *Johnson* v. *American Motors Corp.,* 225 N.W. 2d 57 (N.D.) ).

"What constitutes 'reasonable care' will, of course, vary with the surrounding circumstances and will involve 'a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm' (2 Harper & James, Torts, §28.4; see *Pike* v. *Hough Co.*, 2 Cal. 3d 465, *supra).* Under this approach, 'the plaintiff endeavors to show the jury such facts as that competitors used the safety device which was missing here, or that a "cotter pin costing a penny" could have prevented the accident. The defendant points to such matters as cost, function, and competition as narrowing the design choices. He stresses "trade-offs". If the product would be unworkable when the alleged missing feature was added, or would be so expensive as to be priced out of the market, that would be relevant defensive matter' (Rheingold, Expanding Liability of the Product Supplier: A Primer, 2 Hofstra L. Rev. 521, 537; see *Wirth* v. *Clark Equip. Co.*, 457 F. 2d 1262; *Sutkowski* v. *Universal Marion Corp.*, 5 Ill. App. 3d 313).***

"We next examine the duty owing from a plaintiff or, in other words, the conduct on a plaintiff's part which will bar recovery from a manufacturer. As now enunciated, the patent-danger doctrine should not, in and of itself, prevent a plaintiff from establishing his case. That does not mean, however, that the obviousness of the danger as a factor in the ultimate injury is thereby eliminated, for it must be remembered that in actions for negligent design, the ordinary rules of negligence apply *(Bolm* v. *Triumph Corp.*, 33 N.Y. 2d 151, *supra; Larsen* v. *General Motors Corp.*, 391 F. 2d 495, *supra;* Noel, Manufacturer's Negligence of Design or Directions for Use of a Product, 71 Yale L.J. 816, 818). Rather, the openness and obviousness of the danger should be available to the defendant on the issue of whether plaintiff exercised that degree of reasonable care as was required under the circumstances."

And in reference to strict liability, the court said the following, at 387, 348 N.E. 2d at 579:

"The majority of this court does not favor a reconsideration of *Codling* v. *Paglia (supra)* in which it was stated (p.

342): 'We accordingly hold that, under a doctrine of strict products liability, the manufacturer of a defective product is liable to any person injured or damaged if the defect was a substantial factor in bringing about his injury or damages; provided: (1) that at the time of the occurrence the product is being used (whether by the person injured or damaged or by a third person) for the purpose and in the manner normally intended, (2) that if the person injured or damaged is himself the user of the product he would not by the exercise of reasonable care have both discovered the defect and perceived its danger, and (3) that by the exercise of reasonable care the person injured or damaged would not otherwise have averted his injury or damages.' On this issue, Judge Fuchsberg and I would prefer to adopt the rule taken by a number of States, as embodied in section 402A of the Restatement, Torts 2d."

In regard to an obvious peril, the case of *Lamon* v. *McDonnell Douglas Corp.* (1978), 19 Wash. App. 515, 576 P. 2d 426, 428, is worthy of note. There the plaintiff relied primarily of the theory of strict tort liability. The court properly observed that "strict tort liability is not absolute liability. It is 'strict' in the sense that it is unnecessary for a plaintiff proceeding under that theory to prove that a defendant was negligent and the defendant does not have available the defenses of lack of privity, lack of notice and disclaimer." (*Supra*, at 518, 576 P. 2d at 428.) The court, quoting *Seattle - First Nat'l Bank* v. *Tabert* (1975), 86 Wash. 2d 145, 542 P. 2d 774, stated:

" 'The doctrine of strict liability does not impose legal responsibility simply because a product causes harm. Such a result would embody absolute liability which is not the import of strict liability.***' " (*Supra*, at 519, 576 P. 2d at 429.)

In reference to the concept of "unreasonably dangerous," the court concluded that we are dealing with a relative, not an absolute concept. The court also noted at page 521, 576 P. 2d at 430:

"***[A] product has been said to be unreasonably dangerous if there is an unreasonable risk of causing substantial bodily harm to one whom the manufacturer should expect to be in the vicinity of probable use. Thus, we find various definitions for the term 'unreasonably dangerous' depending

upon whether the approach to the term is from the standpoint of the purchaser, the ordinary user, or the plaintiff [an airline hostess injured by a defective hatch cover], but each definition reaches the same general concept that hazards must exist in the product of which the user would not be expected to be aware and which would not be contemplated by the ordinarily experienced user of that product.\*\*\**The obviousness of the defect is only a factor to be considered in determining whether a defect is unreasonably dangerous.*\*\*\*" (Emphasis added.)

It stated further, at 523, 576 P. 2d at 431:

"The defendant had a duty to exercise reasonable care in designing an escape hatch that did not involve an unreasonable risk of harm to cabin personnel who would be working in the vicinity of the hatch." (Emphasis added.)

In the dissent at 530, 576 P. 2d at 434, we note the following:

"In considering the hatch in question, Dean Wade teaches us that in certain classes of cases involving claims of design defect, the decision of whether strict liability should be imposed should be decided as an issue of law by the courts 'for the reason that the decision involves issues of general social policy.'\*\*\*Furthermore, *Seattle-First Nat'l Bank* v. *Tabert, supra* at 154, instructs that in determining the reasonable expectations of the ordinary consumer, the nature of the product itself may make many unique factors relevant."

The statement in *Lamon* v. *McDonnell* that "the obviousness of the defect is only a factor to be considered in determining whether a defect is unreasonably dangerous," is compatible with Prosser, *supra,* Section 96 and the *DeAmiches* and *Miluka* principles, *supra.*

While we conclude that there may be cases where as a matter of law in Ohio there may be no duty because of an obvious peril as we have indicated above, this generally is a jury issue and was so submitted in the instant case.

Our particular criticism of the charge of the trial court is not to the isolated statements of law, which, in and of themselves may be correct, but rather to the fact that the charge was not tailored to the particular case under consideration. For example, the charge frequently refers to the

subject in the context of a contract and in the context of a seller and a purchaser. The court also referred to the degree of duty owed to an operator. In reference to the use of the product for the purposes for which the machine was intended the jury might have drawn an inference that this was in reference to work in the quarry pit rather than the operation of the vehicle along an access route to the pit, and the duty owed to a pedestrian or a bystander such as this plaintiff's decedent. For the foregoing reasons assignments of error Nos. 1, 2 and 3 are well taken.

Assignment of error No. 4 states:

"It is reversible error to instruct the jury that contributory negligence is a defense to an action based on a breach of implied warranty claim necessitating a defense verdict and then submit to the jury a list of special interrogatories, the first of which states, 'Did Bobby Jones contribute to the accident by his own negligent act of stepping in front of the Euclid R-50 as it started forward?''

First, we would eliminate in a case of this character the words "implied warranty" for the reason that the concept is but a vestige of contract liability. However, for the reasons heretofore stated, this assignment of error is not well taken as to that portion in reference to contributory negligence. Interrogatories submitted to the jury, and answers, were as follows:

"1. Did Bobby Jones contribute to the accident by his own negligent act of stepping in front of the Euclid R-50 as it started forward?

"Answer: Yes (By 8 Jurors)

"2. Did the Defendant, Mr. Hale, have a duty to pedestrians to blow his horn before moving his Euclid R-50?

"Answer: No (By 8 Jurors)

"3. If the answer to No. 2 is yes, was the Defendant, Mr. Hale, negligent in failing to blow his horn before moving the Euclid R-50?

"Answer: (not answered)

"4. If the answers to Nos. 2 and 3 are yes, would the accident have been avoided if Mr. Hale had blown his horn before starting forward?

"Answer: (not answered)

"5. If the answer to No. 2, No. 3 and No. 4 are yes, could

the negligence of Mr. Hale have been reasonably foreseen by Euclid, Incorporated when the particular R-50 involved here left Euclid, Incorporated's control in 1971?

"Answer: (not answered)

"6. Was the Euclid R-50 herein involved defective and unfit for quarry use due to the lack of an automatic forward warning horn?

"Answer: No (By 6 Jurors)

"7. If the answer to No. 6 is yes, did the defect and unfitness directly and proximately cause the accident?

"Answer: (not answered)

"8. Was the Euclid R-50 herein involved defective and unfit for quarry use due to the blind spot looking forward?

"Answer: No (By 6 Jurors)

"9. If the answer to No. 8 is yes, did the defect and unfitness directly and proximately cause the accident?

"Answer: (not answered)

"10. Was the Euclid R-50 herein involved negligently designed due to the lack of an automatic forward warning horn?

"Answer: No (By 6 Jurors)

"11. If the answer to No. 10 is yes, did the negligent design directly and proximately cause the accident?

"Answer: (not answered)

"12. Was the Euclid R-50, herein involved, negligently designed due to the blind spot looking forward:

"Answer: No (By 6 Jurors)

"13. Could Euclid, Incorporated, have reasonably foreseen that someone would step in front of the Euclid R-50?

"Answer: No (by 6 Jurors)"

Interrogatory No. 1 was improperly worded since it makes an assumption of fact which was for the jury. While in view of the answers to other interrogatories it may be argued that this was harmless, the answers to these interrogatories depended on a clear and correct charge. Furthermore, as we observe under assignment of error No. 7, the interrogatories should have been framed in language related to the circumstances of the accident.

This portion of the assignment of error as to interrogatory No. 1 is well taken.

Assignment of error No. 5 reads:

"It was reversible error for the trial judge to exclude the testimony of Mr. Howard Bristow relating to the effect and purpose of a forward warning on the Euclid R-50; whether such systems were available in 1971; and his opinion as to whether or not the design was defective."

As to the admission of evidence and rulings relative to expert witnesses, the trial court has a broad discretion. We have examined the transcript of the testimony of both Mr. Bristow and Mr. Lerner. We find that in view of the testimony of Mr. Lerner to substantially the same matter, if it was error to exclude part of the testimony of Mr. Bristow, the error, if any, was not prejudicial and assignment of error No. 5 is therefore not well taken.

Assignment of error No. 6 is as follows:

"The verdict was against the weight of the evidence."

We find this assignment of error not well taken. The evidence was conflicting and the jury could reasonably have decided for the plaintiff or the defendant under proper instructions.

Assignment of error No. 7 is as follows:

"The court should not have permitted the interrogatories to be submitted to the jury in the form presented."

We have set forth the interrogatories above. Civ. R. 49(B), cited in *Ragone* v. *Vitali & Beltrami, Jr., Inc.* (1975), 42 Ohio St. 2d 161, reads as follows:

"General verdict accompanied by answer to interrogatories. The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law."

As noted in the staff notes, the interrogatories as phrased should be consistent and responsive to the general instructions. We have already commented on Interrogatory 1. As to Interrogatories 6 and 8, as we have indicated, the decedent was on an access road and was a bystander. The interrogatories were not tailored to these circumstances, and the

answers had to be based on instructions in the general charge. For these reasons, the answer to interrogatory 12 is not dispositive. Interrogatory 6 is addressed to the issue of unfitness for quarry use because of the lack of an automatic horn. Most of defendant's testimony on an automatic horn went towards showing that a horn would distract workers in the quarry. Of course, the Euclid R-50 was not confined to use in the quarry, as the accident giving rise to this suit indicates. Interrogatory 8 suffers from the same defects. The determinative issue is not whether the machine was fit for quarry use but whether it was reasonably safe for the purposes and use intended including moving about in the area where Mr. Jones was killed. That interrogatories addressed to a nondeterminative issue can properly be refused was recognized in *Riley* v. *Cincinnati* (1976), 46 Ohio St 2d 287.

Assignment of error No. 8 maintains:

"The court improperly dismissed White Motors as a defendant."

Neither party has approached this assignment with any noticeable degree of enthusiasm. We assume that both White and Euclid are solvent defendants. White Motor is the parent corporation and Euclid is the subsidiary. The correct rule as to the tort liability of the parent for acts of the subsidiary is stated in annotation 7 A.L.R. 3d 1343, as follows: "***[A] parent corporation will be responsible for the obligations of its subsidiary to third parties, when the subsidiary has become a mere instrumentality of the parent corporation." (Page 1347.) From what little can be gleamed from the record and the briefs this was not the case. Assignment of error No. 8 is not well taken.

At this stage of the case and of the opinion it may be of little import to suggest that the certificate attached to the transcript of the evidence does not comply with App. R. 9 prior to its amendment July 1, 1978, and to question whether it complies with amended App. R. 9. Ms. Rotsinger states in the certificate that she is a notary public and that to the best of her ability she has prepared the transcript from audiotapes taken during the hearing of the case. She does not certify that she is a court reporter. App. R. 9(A) calls for proceedings recorded by means other than videotape to be transcribed into written form by the reporter.

Under App. R. 9(B), prior to 1978, the reporter is the person appointed by the court, "who recorded the proceedings." Under the amended rule, the reporter is the person appointed by the court, "to transcribe the proceedings." App. R. 9(B) before and after the amendment requires the reporter to certify that the transcript is correct. If the reporter was not present during the recording, the certificates as to correctness would indeed be difficult. Neither party raises the issue and we do so only in passing and for whatever future value it may have.

The judgment of the Erie County Common Pleas Court as to defendants William Hale and White Motor Corporation is affirmed. The judgment as to defendant Euclid Incorporated is reversed. This cause is remanded for further proceedings according to law.

*Judgment affirmed in part*
*and reversed in part.*

BROWN and CONNORS, JJ., concur.

BROWN, J., concurring. I concur in the judgments and conclusions reached in the majority opinion. I further observe that this is a good case in which to conclude, or in which the Ohio Supreme Court should conclude, that the defense of contributory negligence should be eliminated as part of the substantive law of Ohio and that, in its place, the doctrine of comparative negligence should be substituted.

The defense of contributory negligence is law created by the judiciary and therefore can be eliminated by the judiciary. The first contributory negligence case was *Butterfield* v. *Forrester* (K.B. 1809), 103 Eng. Rpt. 926. The first American case recognizing the defense of contributory negligence was *Smith* v. *Smith* (Mass. 1824), 2 Pick. 621. Prosser on Torts 416, Section 65 (4th ed. 1971), Note 1. For a comparison of early Ohio cases, see *Kerwhaker* v. *C. C. & C. R.R. Co.* (1854), 3 Ohio St. 172, 178; *Mad River and L. E. R.R. Co.* v. *Barber* (1856), 5 Ohio St. 541, 563-564; *Timmons* v. *Central Ohio R.R. Co.* (1856), 6 Ohio St. 105, 108-109 (citing Lord Ellenborough in *Butterfield* v. *Forrester, supra); Puterbaugh* v. *Reasor* (1859), 9 Ohio St. 484, 489; and *B. & I. R.R. Co.* v. *Snyder* (1868), 18 Ohio St. 399, 409-410.

The opinion in the present case, representing the views of a unanimous court, reveals how difficult it is for any jury to apply the contributory negligence rule to the facts and to reconcile such defense with the issue of a defendant's negligence.

With the elimination of contributory negligence as a defense, any facts now considered by the jury under the umbrella of contributory negligence could be considered as factors in determining the issues of the duty of a defendant, his negligence and the proximate result of any negligence.